IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONNA L. DUBIE,

                        Plaintiff,                              CV-07-3055-ST

        v.                                      OPINION AND ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.

STEWART, Magistrate Judge:

## **<u>INTRODUCTION</u>**

Plaintiff, Donna L. Dubie ("Dubie"), seeks judicial review of the Social Security Commissioner's final decision denying her application for Supplemental Security Income ("SSI") benefits. This court has jurisdiction over this claim under 42 USC § 404(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons stated below, the Commissioner's decision is affirmed.

1 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Dubie protectively filed an application for SSI on March 4, 2002, alleging disability beginning August 1, 1991, due to herniated disks in the neck and low back, pain, severe fibromyalgia, and memory problems. Tr. 1335-42.[1] The Commissioner denied her application initially and upon reconsideration. Tr. 1310-22, 1326-32. Dubie requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 6, 2006. Tr. 1683-1721. At the hearing, ALJ John J. Madden, Jr., received testimony from Dubie, who was represented by counsel, and from vocational expert ("VE") Frances Summers. In a decision dated December 14, 2006, the ALJ found Dubie not disabled. Tr. 685-702. The Appeals Council denied Dubie's request for review, rendering the ALJ's decision the Commissioner's final decision. 20 CFR §§ 416.1481, 422.210; *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).[2]

## BACKGROUND

Dubie was 37 when she filed her most recent SSI application. Tr. 701. She has a general equivalency diploma and past relevant work as a kitchen helper. *Id.* Dubie claims to suffer from, and has been treated for, a litany of ailments, including cervical and lumbar degenerative disk disease, recurrent lumbrosacral strain, rotator cuff tendonitis, fibromyalgia, myofascial pain, sciatica, hyperlipidemia, colitis, irritable bowel syndrome, chronic obstructive pulmonary disease and recurrent bronchitis, dysthymia and depression, and chronic fatigue. *See* Tr. 1605-

---

[1] Citations to "Tr." refer to indicated pages in the official transcript of the administrative record filed on January 3, 2008 (docket #12).

[2] Because the Commissioner adopted the ALJ's decision as his final decision, all citations to the Code of Federal Regulations are to the version in effect on the date of the ALJ's decision.

06, 1445-46, 1507.  Both her medical treatment history and her efforts to obtain SSI benefits for her alleged disability are extensive.

## I.    <u>Disability Applications</u>

This case involves Dubie's fifth application for SSI benefits.  She previously filed applications for SSI benefits in February 1992, January 1994, January 1998 and July 2000.  Tr. 688-89.  On February 21, 2002, after a lengthy administrative process, which included several administrative hearings and at least two remands by this district, ALJ Jean Kingrey found Dubie not disabled and denied each of the previous applications for SSI benefits.  Tr. 1285-1307.

For reasons unknown, Dubie did not appeal that decision, making it the final decision of the Commissioner and binding on the question of whether Dubie was disabled at any time from the alleged date of onset through February 21, 2002.  20 CFR §§ 416.1455, .1468; *see Disabled Rights Union v. Shalala*, 40 F3d 1018, 1020-21 (9th Cir 1994), *cert denied*, 516 US 832 (1995).  Instead, less than a month later, Dubie filed a new application for benefits, once again complaining of herniated disks and fibromyalgia causing pain all over, particularly in her neck and lower back, and asserting she was having memory problems.  She also asserted she quit working in 1991 because of pain, fatigue, memory loss and the inability to be around people.

## II.   <u>Medical History</u>

Because she did not challenge the 2002 decision, the period under review is limited to the period beginning February 21, 2002, and extending through the date of the most recent ALJ decision.  Despite the limited time period, both Dubie and the ALJ refer to several medical records preceding the 2002 decision.  Dubie points out that in June 1995, Dr. Karin S. Basin, M.D., examined Dubie on referral from her treating physician, Dr. Roy Lichtenstein, M.D.

Dr. Basin's impression was that Dubie had "Fibromyalgia with many subjective complaints"

which were "obviously very hard to verify in terms of her disability claims." Tr. 1404. In 1998,

orthopedic and occupational medicine specialist Dr. Ruth Lowengart, M.D., opined that Dubie

had "a combination of osteoarthritiis and fibromyalgia along with multiple injuries and evidence

of degenerative disc disease with mild cord compression at C5-6 in particular." Tr. 1409. These

opinions are contradicted by the 1997 opinion of Dr. Daniel A. Saviers who found that while

Dubie had mild cervical and lumbar disk degeneration, there was no clinical evidence of

radiculopathy, peripheral neuropathy, or carpal tunnel syndrome, and there were an insufficient

number of tender points for a diagnosis of fibromyalgia. Tr. 1081-83.

An MRI of Dubie's neck and spine in July 2001 found evidence of a left far lateral disk

herniation at the L3-4 level which appeared to affect the extraforaminal left L3 root. Tr. 1626.

There also appeared to be desiccation and mild annulus bulges at L2-3 and L4-5, but no spinal

canal stenosis or thecal sac compression and mild facet arthrosis at L3-4 through L4-5S. *Id*.

Dr. Lichtenstein, discussed these results with Dubie, noting definite disk herniation with

radiculopathy, and referred Dubie to Dr. Jeffrey Louie to discuss surgical options. Tr. 1537. If

Dr. Louie found that surgery was not indicated, he noted that Dubie should "return to Dr.

Lowengart, who helped lots w[ith] her fibromyalgia." *Id*.

After examining Dubie and reviewing the July 2001 MRI, Dr. Louie determined that

surgery would not help because a far lateral disk at L3-4 would cause left leg pain, but not

chronic, disabling back pain or right leg pain. Tr. 1436. He also noted that the lateral disk could

be an old and chronic finding. But "[b]ecause of the severity of her pain, I did discuss with her

that in my opinion surgical fusion was of benefit in 40% of patients with back pain alone."

Tr. 1438.  He also suggested that Dubie quit smoking as "[t]here is clearly evidence that smoking contributes to back pain and disk herniations[,]" and recommended exercise.  *Id*.

On December 5, 2001, Dubie was involved in a motor vehicle accident in which she rear-ended a car that had slowed for an accident.  Tr. 1634.  This occurred the day after her last hearing before the ALJ concerning her earlier SSI applications.  Dubie contends that this accident exacerbated her already disabling problems and supports her new claim for SSI benefits.

At the hospital after the accident, Dubie complained of some neck and back pain.  *Id*. She denied weakness or numbness in her extremities, but reported that she had chronic neck pain related to cervical disk disease and was taking Vicodin.  A physical exam revealed some paraspinous muscular tenderness and tenderness over the midthoracic area.  An x-ray of the cervical spine revealed no obvious fractures or significant abnormality in her thoracic spine, but did show mild degenerative spurring at C5-6 and C6-7.  Tr. 1637.  The attending physician diagnosed acute cervical and thoracic strain, history of cervical disk disease, and blunt chest trauma.  Tr. 1635.  Dubie was treated and released in stable condition.

At a follow-up visit to Dr. Lichtenstein a week later, Dubie reported pain in her knee, neck, shoulder blades, and back.  On examination, Dr. Lichtenstein observed mildly limited neck rotation, full flexion and extension but with pain at the maximum, and palpable tightness of the paraspinal muscles.  His impression was a cervicodorsal strain, and he recommended continued physical therapy, non-sterroidal anti-inflamatory drugs (NSAIDs) and pain medication.  Tr. 1508.  Despite his treatment plan, Dubie informed Dr. Lichtenstein in January 2002 that she still had not started physical therapy because she was too busy.  Tr. 1499.

A month after receiving the unfavorable decision in February 2002, Dubie returned to Dr. Lichtenstein's office seeking treatment for cold symptoms. Tr. 1489. She complained that her SSI application had been denied and she needed a letter to support her further efforts. She reported her symptoms continued to wax and wane but overall were not as bad as they had been.

In May 2002, Dubie sought treatment of bronchitis. Tr. 1478. She mainly focused on her back pain and presented Dr. Lichtenstein with a list of her complaints which was "rather extensive and certainly nothing we can get involved in today[.]" *Id.* He described them as "longstanding chronic problems" primarily concerning "low back pain." *Id.* He noted that "[s]he has a many year history of back and neck pain with some degenerative disc disease. She was in a motor vehicle accident last December. She had been doing well before that but with definite increase in symptoms since." *Id.*[3] He had observed "significant improvement" applying "conservative management" but "now symptoms are worse again." *Id.* Dubie requested an MRI, but Dr. Lichtenstein explained that "in the absence of specific neurologic deficits or findings," an MRI was not a useful test to diagnose exacerbation of chronic back pain as "the correlation between any general MRI abnormalities and the actual cause of pain is quite poor according to most studies." *Id.* He continued: "Since she has absolutely no interest in surgery whatsoever there is little value or justification for MRI and this will not be ordered." *Id.* Instead, "[s]he will continue with the same measures of conservative management which, albeit slowly, has [*sic*] helped her in the past." *Id.* He also noted that Dubie "continues to be depressed[,] continues to smoke cigarettes [and] [c]ontinues to focus on her disability." *Id.*

---

[3] The court notes that the alternate spellings "disc" and "disk" are used inconsistently throughout the record. This court follows the modern usage standard by which "disk" is used when referring to intervertebral disks but will not change the usage found in quoted sources. *See* GARNER'S MODERN AMERICAN USAGE, 261 (2d ed 2003).

That same month, Dr. Lichtenstein provided Oregon Disability Determination Services (DDS) with his opinion of Dubie's ability to work.  Tr. 1472.  In an eight-hour day, he estimated Dubie could sit one hour at a time, for four hours total; stand one hour at a time, for three hours total; and walk one hour at a time, for four hours total.  Dubie could occasionally lift and carry up to 20 pounds, but should never lift more.  She had no impairment in her ability to handle objects, hear, or speak.  There also were no restrictions on her ability to perform mental activities such as understanding and remembering, to engage in social interaction, or adapt, though there might be a mild reduction in her ability to sustain concentration due to discomfort.  According to Dr. Lichtenstein, this level of functionality was supported by the objective findings of "both my examinations, and that of the neurosurgeon, Dr. Jeffrey Louie."  *Id*.  These impairments would be lifelong, and future treatment would include continuing exercises and medication but no surgery.

Meanwhile, on May 8, 2002, Dubie received a comprehensive psychological evaluation by Dr. Michael F. O'Connell, Ph.D., in conjunction with her new application for SSI.  Tr. 1445-64.  His examination included a clinical interview, brief social history, mental status exam, and 27 different psychological tests.  Tr. 1445.  Dubie reported having extensive physical problems which caused her so much pain that she was "down" 20 hours out of every 24-hour day. Tr. 1445.  She complained of restricted breathing, poor concentration, poor short-term memory, constant diarrhea, incontinence and numerous other maladies.  Tr. 1445-46.  She indicated that she had undergone three years of counseling as a child and one year of counseling as an adult with no positive result.  Tr. 1448-49.  Because prescribed antidepressents had caused weight gain and aggressive behavior towards her son, she discontinued using them.  Tr. 1449.  She reported

preparing about 75% of her own food, doing 90% of the kitchen cleanup and housework, doing

all her own laundry and shopping, and driving 80% of the time.  Tr. 1450.  In recent months, she

needed assistance with basic activities of daily living due to significant pain flare-ups.  *Id*.  She

now had constant pain all over her body, except in her knees, with the most severe in her neck

and back.  Tr. 1446.  Her pain was usually at a level 10-out-of-10, but was 7-out-of-10 with

medications.  *Id*.

During her mental status exam, Dubie appeared to be in mild discomfort.  Testing

revealed that Dubie had average intellectual ability and average immediate and delayed memory

capabilities.  She was able to concentrate for a moderately lengthy period of time.  Dubie's

Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") did not produce a valid profile

because the clinical scales were "artificially elevated" which was most likely caused by her

"overelaboration of symptoms."  Tr. 1457.  She did, however, give a valid Millon Clinical

Multiaxial Inventory-II ("MCMI-II") which indicated a "moderately high distress profile,"

meaning, Dubie endorsed a large number of symptoms of depression and anxiety.  *Id*.

Dr. O'Connell next gave the following analysis on Dubie's test reslults:

> In addition, she tests as a person who is likely characterized by a tough,
> no-nonsense attitude toward the world.  She is likely to be convinced that
> her survival depends on her ability to compete, to outmaneuver others, and
> to avoid any signs of weakness or vulnerability.  She is likely driven by a
> fear of being treated unfairly by others and an urge to avoid this by
> gaining power and dominance over these other people in her life.  Most
> commonly, individuals with this pattern of results . . . are restless and
> struggle to endure the daily routines of work, marriage, or family life.
> They have difficulty in sustaining consistent work performance because of
> an inability to delay gratification, limited frustration tolerance, and
> resentment toward authority.  Instability in relationships may result from a
> cold or callous attitude, limited empathy, and fluctuating emotions that
> may include flare-ups into verbal abuse or, with less likelihood, physical
> aggression.  It is likely that Donna has limited tolerance, limited patience,

and limited ability to modulate her emotions or her behavior.  It is also possible that she has not internalized the typical value of society.

Tr. 1457-58.

Dr. O'Connell diagnosed Dubie with: Axis I:  Dysthemic Disorder; Pain Disorder Associated with Psychological Factors and General Medical Condition; Amphetamine Dependence reported in full, sustained remission; Axis II:  Personality Disorder NOS with passive-aggressive and borderline features; and assigned her a GAF of 60.[4]  He further opined that her prognosis was poor.

With respect to treatment options, Dr. O'Connell concluded that mental health treatment would not benefit Dubie because she "has committed considerable energy over the course of the last decade in establishing herself as a disabled person."  Tr. 1459.  Due to this focus, he doubted "that she would have any additional time or energy to invest in psychological services . . . [and] may feel a powerful need to document her disability which would likely be a very disruptive force . . . [to] psychotherapy services." *Id.*

Dr. O'Connell completed a Mental Residual Function Capacity Report attendant to his evaluation.  He opined that Dubie was moderately restricted in her activities of daily living, markedly restricted in social functioning, and mildly restricted in concentration, persistence or pace.  Tr. 1462.

---

[4]  The GAF is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000) ("DSM-IV").  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  A GAF score between 41 and 50 indicates "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.*.  A GAF between 51 and 60 indicates "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

Dr. Lichtenstein saw Dubie again in December 2002 when she reported a recent exacerbation of symptoms.  Tr. 1605-06.  She had increased aches and pains, keeping her in bed more than usual, and some migratory paresthesias in her feet, hands and leg.  On one occasion she felt completely numb all over.  Her neck and back pain continued to wax and wain, and her generalized weakness and fatigue had increased along with some difficulty balancing.  Dubie referenced her multiple bad experiences, poor health habits, drug abuse, stress and motor vehicle accident.  Dr.  Lichtenstein noted that "[s]he is definitely severely depressed though stress level is no more or less as waxing and waning since age 13."  Tr. 1605.  She stressed that "she just wants to know what is wrong with her and if it is just the fibromyalgia, what can be done about it."  *Id.*  She said that she had given up on her social security claim, though she felt she qualified for it.  Dr. Lichtenstein's assessed Dubie with:

> "1. Fibromyalgia, chronic.  2. Depression, chronic, declining medication, likely contributing to her musculoskeletal difficulties.  3. History of cervical disc disease with chronic neck pain.  4. History of lumbar degenerative disc disease and intermittent sciatica.  5. Irritable bowel syndrome.  6.  History of peptic ulcer disease, not especially active now.  7.  History of hyperlipidemia, off medication. 8.  Onset of migratory paresthesias, uncertain cause.

Tr. 1605-06.

Dr. Lichtenstein proposed a number of tests and urged Dubie to be open minded about the use of certain medications she had rejected.  Tr. 1606.  If all lab studies were negative, he would recommend evaluation by a rheumatologist for fibromyalgia and consideration of Mirapex treatment.[5]

---

[5]  Mirapex can apparently be used to treat fibromyalgia.  *See Fibromyalgia Medications: A New Advancement - Mirapex, available at* http://www.fibromyalgia-symptoms.org/fibromyalgia_neurotransmitter.html, *last accessed* Nov. 21, 2008.

In February 2003, Dubie saw Dr. Lichtenstein for congestion, but spoke mostly about her problems with obtaining disability.  Tr. 1604.  She brought in a print-out of the requirements she needed to document and indicated that she believed that the previous MRIs and records provided for her previous applications were insufficient for her new claim.  She asked him for new documentation and "[a]t great length she elaborat[ed] on her symptoms of waxing and waning but always present low back pain and pain shooting down her leg as well as neck pain and pain into her arm."  *Id*.  She complained that many of the doctors she had seen were unhelpful except for Dr. Lowengart who helped with her Fibromyalgia but not with her disk related symptoms.  Dr. Lichtenstein recommended physical medicine and rehabilitation consultations with several doctors, as well as  electrodiagnostic studies.  He also noted that she may need repeat MRIs if still more evidence was required for her claim.

Dubie saw Dr. Lichtenstein again in May 2003, "describing her ongoing whole body pain, particularly [in her] arms and legs and her various legal manipulations to try and continue to get disability."  Tr. 1603.[6]  She had cancelled the electrodiagnostic study because she found the thought of it too painful, but "[a]gain pushed to have repeat MRIs done for her neck and back and [Dr. Lichtenstein] explained to her why [it] was not an inapppropriate [*sic*] step at this stage."  *Id*.  She agreed to proceed with electrodiagnostic studies.[7]  Dr. Lichtenstein also noted that "[o]nce again we discussed her use of pain medication and keeping it within a specific

---

[6] This is her last appointment with Dr. Lichtenstein and it appears that she was dropped from Providence Medical Group (where Dr. Lichtenstein was employed) at some point in 2002 or 2003, though the record is not clear.

[7] The electrodiagnostic study was conducted a month later and found "no evidence of carpal tunnel syndrome, ulnar neuropathy, or polyneuropathy."  Tr. 1593.  However, Dubie claims that the study appearing in her medical record does not belong to her, and the results could not have been from her test.  According to the report, Dr. Kevin J. Sullivan conducted the test and interpreted the result.  Tr. 1592.  Dubie maintains that she was seen by a Dr. "Carleeni" who administered a different test than the one in the report and addressed her lower back and leg problems, not problems with carpel tunnel in her wrists.  Tr. 1693-95.

number[, and] how all of [her] symptoms could easily be accounted for by what is commonly seen in fibromyalgia." *Id*.

The medical record is silent for the next six months until late December 2003 when Dubie underwent another comprehensive psychological exam (Comprehensive Psychodiagnostic Exam/Report with Complete Psychological Testing) with Dr. Grant C. Rawlins, Ph.D. Tr. 1641-50. It was conducted over three separate days due to physical discomfort Dubie exhibited during the testing, which lasted a total of four-and-a-half hours. Tr. 1641, 1645. When asked what interfered with her ability to work, she replied, "Fatigue. I have no strength. My muscles are atrophied. And pain and stress." Tr. 1643. She was appropriately dressed and groomed and she demonstrated appropriate interpersonal skills though she seemed anxious and depressed. Dubie reported that for the past two years she had spent most of her time in bed, or sitting on the couch watching television. Tr. 1643, 1646. She only left her house once or twice a month, did little housework, could seldom stand long enough to do the dishes, didn't cook but ate frozen dinners. She avoided shopping, and a friend helped her with cleaning her house though friends and family only occasionally stopped by. She bathed about once every two weeks, and had difficulty maintaining hygiene and grooming.

During her mental status exam, Dr. Rawlins noted that "[s]he appeared to be adequately motivated and cooperative, and there was no indication of exaggeration or malingering." Tr. 1644. She had average or above average intellectual ability. Although she passed her short and medium-term memory tests, she added that on "[s]ome days I can't even hold a conversation because I forget words or start a sentence and forget what I am saying." *Id*. This led Dr. Rawlins to write that "[i]t appears that her memory is generally adequate, other than times in

which medication and pain interfere." *Id.* Dubie also reported having significant sleep

disturbances which caused her to get a maximum of five hours of sleep at a time though she

spends most of her days in bed.

Dubie again produced an invalid MMPI-2 result "due to [her] endorsement of an

exceptionally high number of items reflecting psychopathology." Tr. 1648. Dr. Rawlins

extensively commented on the import of this result:

> Although the validity rules preclude normal evaluation of this test, the list
> of critical items is generally consistent with interview and other data. The
> only critical items I feel may be serious exaggerations are some of those
> listed as "Mental Confusion," "Deviant Thinking and Experience," and
> "Deviant Beliefs." . . . [F]or the most part, in my opinion, the critical items
> accurately reflect Donna's concerns and attitudes. On other hand, it is
> also not uncommon for people who are feeling desperate to exaggerate
> some of their concerns. Just because they may have exaggerated
> something, however, does not necessarily invalidate the totality of their
> complaints.

Tr. 1648.

As to functional limitations, Dr. Rawlins found Dubie had "symptoms of Dysthymic

Disorder (chronic depression, sleep disturbance, low energy, low self-esteem, difficulty

concentrating and making decisions, and feelings of hopelessness)." *Id.* She had a chronic high

level of anxiety and some antisocial and paranoid attitudes. He noted that she had many physical

complaints and likely "experiences somatoform exacerbation of symptoms." *Id.* Dr. Rawlins

believed her testing supported her subjective complaints:

> Her description of her pain and disability was subjectively convincing,
> and she expressed a desire to work and support herself. In my opinion,
> significant conscious exaggeration of symptoms is not likely to be a major
> issue with Donna. If medical findings do not validate the degree of pain
> and limitation of which she complains, the diagnosis of somatization
> would be strengthened. In my opinion, it is probable that a diagnoses of
> Pain Disorder Associated with Both Psychological Factors and a General

> Medical Condition is indicated.  Medical information was not available,
> and it is possible that all of her complaints can be medically verified.  If
> so, the somatization diagnosis should be eliminated.  In my opinion, her
> symptoms of Dysthymia and her Somatization Disorder significantly
> impair her functioning in all aspects of her life.

Tr. 1648-49.

Accordingly, Dr. Rawlins diagnosed Dubie with:  Axis I:  Pain Disorder Associated with

Both Psychological Factors and General Medical Condition, Dysthemic Disorder, Anxiety

Disorder NOS; Axis II:  Personality Disorder NOS with Antisocial, Paranoid and Schizoid

Traits.  Tr. 1649.  He assigned her a GAF of 45, both currently and over the past year, and

opined that Dubie was "likely to improve slowly, if at all."  Tr. 1650.  She would require "long-

term intensive psychotherapy" and "[a]ntidepressant medication may be of at least limited

benefit."  *Id*.

The next two medical records are hospital emergency room reports from March and

August 2004.  Tr. 1627-33, 1651-52.  At the first, Dubie presented complaining of severe

diarrhea over the past a week.  She explained that she and Dr. Lichtenstein had "been having

some misunderstandings" and she was trying to find another doctor, which the attending

physician attributed to her trying to find a physician who would "write for more narcotics than

Dr. Lichtenstein."  Tr. 1627.  A CT scan of the spine was "essentially negative" showing only

mild posterior osteophyte, right lateral at L4-5 and mild disk space narrowing at L3-4 and 4-5

levels.  There was no spinal stenosis or other severe problem.  Tr. 1628.  The attending physician

diagnosed her problem as "Chronic low back pain with acute exacerbation, history of colitis,

narcotic withdrawal syndrome with diarrhea."  *Id*.  Dubie asked for a prescription for Lortab

which the attending physician provided "pending she has a recheck appointment with

Dr. Lichtenstein early next week." *Id*.

About four months later, Dubie complained of intestinal problems including constipation,

diarrhea and abdominal pain. Tr. 1651-52. She reported having colitis since she was a child,

which got worse after her 2001 accident, and herniated disks. Dubie was given medication for

abdominal pain and was referred to another doctor.

On October 14, 2004, Dubie saw Dr. Pedro Bujosa, M.D., with the Providence Medical

Group ("PMG"). Dr. Bujosa noted that Dubie had been treated at the hospital again sometime in

October 2004 for pain in her arm and noted Dubie been dismissed from PMG's practice without

offering any explanation. Dubie reported a "multitude of nonspecific complaints – occasional

diarrhea, occasional stomach upset, irregular menses, [and] chronic back pain." Tr. 1599. Her

physical examination was unremarkable. Dr. Bujosa refilled her Donnatol (which reduces

spasms in the intenstines) gave her some additional pain medications, but indicated that Dubie

"needs to find another doctor for her primary care." Tr. 1600.

Over a year later, the Department of Human Services referred Dubie to Dr. Yung K. Kho,

M.D., for a neurological consultation. Tr. 1654-61. Dr. Kho interviewed Dubie, reviewed her

medical history (including an "inch thick" medical chart), conducted a neurological exam and

completed an agency form recording her ability to do work-related activities. Dubie said she had

last worked 10 to 15 years ago, had three car accidents in 1989 and was in an accident in 2001

after which she spent two years in bed, but for which "[s]he did not see a physician." Tr. 1654.

Dubie reported her symptoms occurred mainly in her neck and radiated up and down the spine.

She had low back pain, popping in and around the joints, and was getting migraines again. The

pain rendered her unable to open her eyes, and sometimes made her nauseous or dizzy.  She could not eat or sleep, although she wanted to sleep all the time.  Tr. 1654-55.

In the "Review of Systems" portion of his report, Dr. Kho noted that Dubie was positive for a laundry list of problems including pneumonia, chronic obstructive pulmonary disease, shortness of breath, wheezing, loss of grip/strength, headache, knocked unconscious, numbness, weakness, insomnia, head trauma/concussion, paralysis, migraine, fatigue, spinal cord injury, dizziness, back pain, difficulty walking, back injury, arthritis, fibromyalgia, fracture h[istory], neck pain, stiffness, osteoporosis, abuse, anxiety depression, anemia, loss of urine, kidney trouble, heartburn, peptic ulcer, indigestion, GI bleed, constipation, diarrhea, irritable bowel, jaw lock, ringing in her ears, hearing loss, TMJ, and high cholesterol.  Tr. 1655.  Presumably the fact that she had suffered from these maladies was gleaned from his review of Dubie's "voluminous records."  *Id*.

Dr. Kho's neurological examination revealed very few abnormalities.  Her eyes, ear, nose and throat, cranium, cranial nerves, cerebellar, muscle, reflexes, and sensory exams were "normal."  Tr. 1656.  On general examination Dubie's test results were normal except that she had anterior flexion of 60 degrees and posterior extension of 10 degree, though it was somewhat more painful.  *Id.*  Dr. Kho diagnosed: "1.  Psychogenic pain syndrome with:  2.  Dysthymic disorder, depression, anxiety disorder.  3.  Personality disorder, with antisocial paranoid schizoid and borderline traits.  4.  Mechanical low back pain."  Tr. 1656-57.  It was Dr. Kho's impression that Dubie was "essentially a 40 year old with an array of psychiatric, psychological behavioral problems.  The pain syndrome is more psychogenic in nature. . . . From a neurological standpoint, she can stand, walk and sit four hours at a time during an eight hour day."  Tr. 1657.

Dr. Kho's opinion of Dubie's capabilities for work is muddled by his responses on the form he filled out attendant to his examination.  On the form he noted that Dubie could lift 20 pounds occasionally and 10 pounds frequently and was not limited in her ability to push or pull, but could only stand or walk less than two hours in an eight-hour workday.  Tr. 1658.  She could sit for less than about six hours in an eight-hour workday.  Tr. 1659.  She could only occasionally climb, balance, kneel and crouch, and could never crawl or stoop.  Despite indicating that Dubie was unlimited in her manipulative functions, he confusingly marked that she could only occasionally perform the functions of handling, fingering, and feeling.  Tr. 1660. He also found a variety of environmental limitations.

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909; 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy withinin the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 416.966.

## ALJ'S FINDINGS

Before addressing her claim on the merits, the ALJ noted that Dubie had not appealed the 2002 decision finding her not disabled and concluded that there was no basis for reopening this decision.  Tr. 689.  Dubie does not challenge this finding.  The ALJ found that Dubie had submitted adequate new and material evidence to rebut the presumption of a continuing non-disability which ordinarily applies following a final unfavorable decision.  *Id*; *see Chavez v. Bowen*, 844 F2d 691, 693 (9th Cir 1988).

On the merits, the ALJ found for Dubie at steps one and two, but not at step three. Tr. 691-92.  He found that Dubie suffered from the severe impairments of degenerative disk disease of the lumbosacral spine, pain disorder, mild dysthymic disorder, and mild anxiety disorder but had no impairment or combination of impairments that met or medically equaled one of the listed impairments.  Tr. 692.  The ALJ assigned Dubie the RFC:

> to sit, stand, or walk for six hours in an eight-hour day, with the ability to change positions from sitting to standing or back every hour; she can lift 20 pounds occasionally and 10 pounds frequently; she should not perform overhead reaching; she should not perform forcible grasping of more than 10 pounds frequently or 20 pounds occasionally; she should not interact with the general public at work.

*Id*.

The ALJ found that contrary opinions of Dubie's RFC were not credible for a variety of reasons, but most importantly because they relied heavily on Dubie's incredible and unsupported subjective complaints.  Tr. 693-700.

At step four, Dubie's RFC precluded her from performing past relevant work.  Tr. 701. But considering Dubie's age, education, work experience and the above RFC, the VE testified that significant numbers of jobs existed in the national economy that she could perform.  Tr. 701-02.  The ALJ accepted this testimony and found Dubie not disabled at step five of the disability analysis.  Tr. 702.

///

///

## **DUBIE'S CHALLENGES**

Dubie asserts multiple challenges to the ALJ's decision.  She primarily complains that the ALJ rejected the opinions of her treating and examining physicians, as well as her own testimony, without providing clear and convincing reasons.  Instead the ALJ substituted his own opinion for that of her physicians, thus improperly making his own independent medical findings and speculative inferences.  She also claims that the ALJ erred by not finding her fibromyalgia a severe impairment and by failing to properly consider the combined effects of her impairments in determining whether, taken together, they equal one of the listed impairments.  Finally, she alleges that the ALJ isolated a specific quantum of evidence without considering the evidence as a whole.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

### I.    Severe Impairments

Dubie argues that the ALJ erred at step two of the disability analysis by not considering her fibromyalgia to be a severe impairment.  An impairment is severe if it significantly limits the ability to do basic work activities. 20 CFR § 416.921(a).  These include physical functions, such as seeing, hearing, speaking, walking, standing and sitting, and mental functions, such as understanding, remembering, using judgment and responding appropriately to work situations. 20 CFR § 416.921(b).

The ALJ found that Dubie has severe impairments.  Tr. 692.  He was then required to continue the sequential analysis and consider the combined effect of all Dubie's impairments, both severe and nonsevere.  20 CFR § 416.923.  Because step two was resolved in Dubie's favor, any error made by the ALJ at step two is harmless.  *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F3d 1050, 1055 (9th Cir 2006), citing *Burch v. Barnhart*, 400 F3d 676, 682 (9th Cir 2005) (finding error harmless where it was "inconsequential to the ultimate nondisability determination").  The issue is whether the ALJ properly determined the functional limitations imposed by all of Dubie's impairments in the remaining steps of the analysis.

## II.    Listed Impairments

Dubie also contends that the ALJ erred by failing to find her condition equivalent to one of the presumptively disabling Listing of Impairments.  Although Dubie does not specify which impairments specifically the ALJ should have addressed, several mental disorders found in § 12.00 appear *apropos*; specifically:  12.04 Affective Disorders, 12.06 Anxiety Related Disorders, 12.07 Somatoform Disorders, and 12.08 Personality Disorders.  All include diagnostic criteria that Dubie's medical history could support.

The Listing of Impairments "describes for each of the major body systems impairments that [the administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 CFR § 416.925(a). A claimant will be found disabled if his or her impairment meets or equals a listed impairment. 20 CFR § 416.920(d); *see Lester v. Chater*, 81 F3d 821, 828-29 (9th Cir 1995).

The Listing of Impairments dictates specific medical findings and characteristics which are required in establishing a diagnosis or confirming the existence of a listed impairment. 20 CFR § 416.925(c). Simply obtaining a diagnosis of a listed impairment is not sufficient. The claimant must show that "he or she meets each characteristic of a listed impairment relevant to his or her claim." *Tackett*, 180 F3d at 1099; 20 CFR § 416.925(d); *see also*, SSR 86-8, 1986 WL 68636 (1986). Alternatively, if a claimant's condition does not *meet* the requirements of a listed impairment, she can show that her condition nonetheless *equals* a listed impairment by showing "symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment," or to the "listed impairment 'most like' the claimant's impairment." *Tackett*, 180 F3d at 1099; 20 CFR §§ 416.925-.926  If a claimant suffers from multiple impairments, no one of which individually meets or equals a listed impairment, the Commissioner must evaluate the symptoms, signs and laboratory findings of all impairments to determine whether the combination of impairments is medically equal to a listed impairment. 20 CFR § 416.926.

For mental disorders, the Commissioner must first evaluate the pertinent symptoms, signs and laboratory findings to determine whether a claimant has a medically determinable mental impairment that satisfies the diagnostic criteria (paragraph A) of the listing. 20 CFR

§ 416.920a(b)(1); Listing of Impairments, §12.00A.  Next the Commissioner evaluates the degree of functional limitation resulting from the mental impairments by utilizing the criteria in either paragraph B or C of the listing.  20 CFR § 416.920a(b)(2); Listing of Impairments, 12.00A.  The B criteria include four categories:   (1) restrictions of activities of daily living; (2) difficulties in maintaining social functioning; (3) difficulties in maintaining concentration, persistence or pace; and (4) extended periods of decompensation.  The required level of severity is shown if the claimant establishes marked limitation in at least two of the four categories; marked impairment in the fourth category is demonstrated by repeated episodes of decompensation.  20 CFR § 416.920a(c); Listing of Impairments, § 12.00C.  If the paragraph B criteria are not satisfied, the Commissioner next evaluates, where applicable, whether the claimant meets the paragraph C criteria.  Listing of Impairments, § 12.00A.

A determination whether a claimant's condition meets or equals a listed impairment "must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques[;]" a claimant's testimony alone is insufficient.  SSR 86-8, *4. The documented medical judgment of a physician meets this requirement.  *Id*.  Although medical opinions are necessary to establish the presence of a listed impairment, the opinion of a physician is not controlling on this issue as "the final responsibility" of deciding this issue is "reserved to the Commissioner."  20 CFR § 416.927(e)(2); *see also*, SSR 96-5p, 1996 WL 374183 (July 2, 1996).

Dubie's difficulty in demonstrating that she meets any of these listings is the absence of any medical opinion which explicitly finds the presence of the requisite number of paragraph B or C criteria.  Dr. O'Connell found Dubie to have "marked" restrictions in only in one of the

paragraph B criteria.  Otherwise, he found her restrictions moderate or mild.  This conflicts

somewhat with Dr. Rawlins' opinion that Dubie's " symptoms of Dysthymia and her

Somatization Disorder significantly impair her functioning in all aspects of her life."  Tr. 1649.

Dr. Rawlins did not elaborate on what he meant by "significant" or complete a mental RFC

form.  Dubie's treating physician, Dr. Lichtenstein, opined that Dubie had "no restrictions on her

ability to perform mental activities such as understanding, remembering, social interacting and

adapting," but possibly "a mild reduction in her ability to sustain concentration due to

discomfort."  Tr. 1472.  Dr. Lichtenstein extensively treated Dubie and presumably would know

her mental and physical condition the best.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d

595, 600 (9th Cir 1999) ("The opinion of a treating physician is given deference because he is

employed to cure and has a greater opportunity to know and observe the patient as an

individual.") (internal quotations and citation omitted).  His very mild conclusions stand in stark

contrast with the more severe opinion of Dr. Rawlins.

　　　　The ALJ concluded that Dubie had only mild impairment of her ability to perform the

activities of daily living, moderate difficulty in sustaining social functioning and mild difficulty

in sustaining concentration, persistence or pace.  Tr. 692.  In light of the conflicting medical

evidence in the record, this court concludes that the ALJ's findings on this point are not in error.

*See Andrews v. Shalala,* 53 F3d 1035, 1039-40 (9th Cir 1995) ("The ALJ is responsible for

determining credibility, resolving conflicts in medical testimony, and for resolving

ambiguities.") citing *Magallanes v. Bowen,* 881 F2d 747, 750 (9th Cir 1989).  Absent the

presence of the paragraph B or C criteria, Dubie cannot prove she had one of the listed mental

impairments.

Dubie has also failed to "offer any theory, plausible or otherwise, as to how [her] impairments combined to equal a listing impairment." *See Burch*, 400 F3d at 683. Indeed, she has not even attempted to demonstrate what "symptoms, signs and laboratory findings" specifically support a finding that she meets any of the paragraph B criteria for the mental listings or, for that matter, the criteria for any other listing. The ALJ did not err by failing to discuss whether her impairments equaled a listed impairment. *Id.*

## III.    RFC

### A.    Dubie's Challenges

Dubie's central criticism is that the RFC adopted by the ALJ does not accurately reflect her actual functional ability. Dubie contends that her subjective complaints and the objective medical evidence overwhelming demonstrate that she suffers from a number of severe impairments which cause a litany of exertional and non-exertional limitations. When these limitations are included in her RFC, Dubie is unable to perform any work available in the national economy. To reach a contrary result, Dubie asserts that the ALJ improperly rejected her her subjective complaints and the opinions of her treating and examining physicians.

The impact of the various hypotheticals considered by the VE demonstrates the importance of the RFC assigned to Dubie. Dubie challenges the ALJ's reliance on the broadest RFC provided by the DDS reviewing physician. Tr. 1714-15. Based  on this RFC, the VE found that Dubie could perform the jobs of office helper, basket filler and assembler of small parts. But even if the ALJ erred by accepting this opinion, the VE also found that Dubie was capable of working based upon several other opinions, including the one provided by Dr. Lichtenstein. Thus in order to prevail at this point in the ALJ's analysis, Dubie must demonstrate not only that

the ALJ erred in accepting the reviewing physician's RFC, but also that he should have found a
more restrictive RFC than was suggested by her own treating physician.

**B.**     **Dubie's Credibility**

**1.**     **Subjective Complaints**

Dubie's subjective complaints support a greater level of disability than found by the ALJ.
In general, her statements portray her as a person who is in constant pain due to herniated disks
and severe fibromyalgia; who is always on pain medications which causes her to be drowsy and
unable to sleep; who stays in bed most of the day and night even though she gets only broken
sleep; who gets out of bed for a maximum of two to four hours at a time and then must rest
again; who rarely goes out and only when it is absolutely necessary, at most two times a month;
who tries to do chores, infrequently, but does not always finish them; who sometimes tries to
cook, mostly frozen dinners; and whose pain causes her to have very poor grooming, taking
baths only once a week. *See* Tr. 1341-42, 1358-68.  On several occasions she has stated that her
symptoms worsened after the December 2001 accident.  Tr. 1364, 1478.  She has told several
sources that after the accident she spent almost two years in bed.  Tr. 1643, 1654.

At the hearing Dubie repeated her claim that she spent two years in bed after the
accident.  Tr. 1693.  She testified that on a good day she is able to get five hours of sleep and is
able to be up with intermittent rests throughout the day.  Tr. 1697.  On a bad day she must lie
down all day but only sleeps two hours at a time.  She does not prepare her food, has not read a
book "in forever" and tries to do some stretching to help her back.  Tr. 1698.  Since her last
hearing, her head has cleared up but her body has gotten worse.  Tr. 1700.  She lives with

constant fatigue, dizziness at times, migraines, constant pain at different levels.  Sometimes her

pain pills help and sometimes they do not.

If Dubie's testimony and statements are taken at face value, she is not capable of working

eight hours a day.  However, the ALJ found Dubie not fully credible because the evidence

"constantly shows that she exaggerates her subjective perception of her medical or psychiatric

symptoms."  Tr. 696.  He also found that Dubie is "an unreliable informant regarding her mental

condition" and "[b]y extension, she is unreliable regarding her physical symptoms as well."  *Id*.

Finding Dubie's subjective complaints not credible enabled the ALJ to challenge the validity of

physicians who relied on her subjective complaints in reaching conclusions about her mental or

physical health.

### 2.    Standards

Once a claimant shows an underlying impairment which may reasonably be expected to

produce the pain or other symptoms, and absent any evidence of malingering, the ALJ must

provide "clear and convincing" reasons to discredit the claimant's testimony regarding the

severity of symptoms.  *Lingenfelter,* 504 F3d at 1036 (citations omitted).  The ALJ's credibility

findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did

not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir

1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may

consider objective medical evidence and the claimant's treatment history, as well as the

claimant's daily activities, work record, and observations of physicians and third parties with

personal knowledge of the claimant's functional limitations.  *Smolen v. Chater*, 80 F3d 1273,

1284 (9th Cir 1996).  The ALJ may also employ ordinary techniques of credibility evaluation,

such as weighing inconsistent statements regarding symptoms.  *Id*; *see also* SSR 96-7p, 1996

WL 374186 (July 2, 1996).  Once a claimant shows an underlying impairment, the ALJ may not,

however, make a negative credibility finding "solely because" the claimant's symptom testimony

"is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F3d at 883

(citation omitted).

> 3.      **Analysis**

The ALJ found that Dubie's underlying impairments could reasonably be expected to

produce symptoms of the type she alleges, but that her "statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible."  Tr. 700.  The ALJ gave

multiple reasons for doubting her credibility.  Because he did not find make a finding that Dubie

was malingering, these reasons must be clear and convincing and supported by substantial

evidence.

> a.      **Exaggeration**

One reason given by the ALJ was that the evidence "constantly shows that [Dubie]

exaggerates her subjective perception of her medical or psychiatric symptoms."  Tr. 696.  A

tendency to exaggerate is a legitimate basis for finding a claimant lacks credibility.  *See*

*Tonapetyan v. Halter*, 242 F3d 1144, 1148 (9th Cir 2001).  The ALJ pointed to several records as

evidence of her exaggeration.  First, the ALJ noted that she had been found incredible regarding

her allegations of disability in each of her prior administrative hearings.  Tr. 696.  A lack of

credibility in the past may permit some weak inference of a current lack of credibility.

The ALJ also relied on the fact that Dubie consistently produced invalid results during

psychological testing.  The ALJ noted that at least three examining psychologists found that

Dubie failed to produce a valid profile on her MMPI-2. Tr. 1084-90 (Dr. Morrell); 1445-65

(Dr. O'Connell); 1641-50 (Dr. Rawlins). Each examiner's opinion differs on the significance of

this result. Dr. Rawlins opined that Dubie's responses on the MMPI-2 were "generally

consistent with interview data" despite some evidence that they were "exaggerated." Tr. 1648.

He noted that three "critical items," in particular, might have been "serious exaggerations." *Id*.

He opined, however, that "significant conscious exaggeration of symptoms is not likely to be a

major issue with Donna." Tr. 1649. Rather, to the extent that her purported symptoms were not

confirmed by medical findings his "diagnosis of somatization would be strengthened." *Id*. Dr.

O'Connell indicated that the invalid MMPI-2 was caused by Dubie's "overelaboration of

symptoms" which caused the clinical scales to be "artificially elevated." Tr. 1457. As a result if

its invalidity, he made no attempt to interpret the results of this test. Dr. Morrell commented that

"it is possible that this patient is presenting a cry for help; nonetheless, this examiner opines that

the test results today could not possibly represent the degree of pathology seen in this

individual." Tr. 1084. As a result, the invalid results of Dubie's several MMPI-2 are

ambiguous.

Given the ALJ's responsibility to resolve ambiguities in the medical record, the ALJ's

conclusion that her repeated failures to produce a valid MMPI-2 profile reflected negatively on

her credibility is not an unreasonable one. Even Dr. Rawlins noted that Dubie exaggerated at

least some of her responses, even though exaggeration was not a "major issue," and Dr. Morrell

felt her responses "could not possibly" represent the degree of pathology he observed. The

ALJ's conclusion that Dubie exaggerated her psychological condition is further supported by the

disparity between her claims of memory impairment and the results of psychological testing:

both Dr. Rawlins and Dr. O'Connell found her memory to be functioning in the average or high-average range.

The ALJ also found that Dubie tended to exaggerate the effects of her December 2001 accident. She told Dr. Rawlins that her condition had been much better prior to the accident and got worse after it. But on the day before the accident, Dubie testified at a disability hearing that she had been unable to work since 1991 due to her severe disabilities and reported symptoms very similar to those submitted here. The contemporaneous records of the accident show that she was treated and released for only acute lumbar or cervical strain, and no medical record shows that she was confined to bed for a two-year period. Just one month after her accident she reported that she had not begun physical therapy as prescribed by her physician because, in part, she had been "too busy." Tr. 1499. A little over three months after her accident she reported her symptoms waxed and waned but were "overall not as bad." Tr. 1489. Finally, five months after the accident Dr. Lichtenstein opined that Dubie could perform a reasonable level of work activity. Tr. 1472.

This last opinion by Dr. Lichtenstein is strong evidence that conflicts with Dubie's account that she was bedridden. Dubie asserts that this opinion did not address the impact of her accident because Dr. Lichtenstein had declined to address her report of increased symptoms. However, Dr. Lichtenstein examined her after the accident and spoke with her about her claimed increase in symptoms prior to issuing his opinion. Tr. 1507, 1478, 1499. It is reasonable to conclude that he would have incorporated any increases in symptom severity into his opinion. In fact, his report explicitly commented that "[t]here has not been any substantial change in her capabilities" from prior opinions he issued in support of her previous applications. Tr. 1472.

This is highly damaging to her claim that the 2001 accident increased the severity of her symptoms and left her bedridden for two years.

In contrast to this evidence, Dubie has repeatedly and consistently maintained that her symptoms increased after the accident.  Tr. 1446 (May 2002 to Dr. O'Connell); Tr. 1478 (May 2002 to Dr. Lichtenstein); Tr. 1364 (May 2002 in SSI application); Tr. 1654 (November 2005 to Dr. Kho); Tr 1651 (August 2004 to ER doctor).  Again, it was within the ALJ's province to weigh this conflicting information.

This court concludes that a rational person viewing this evidence could find that Dubie has a tendency to exaggerate her symptoms.  Thus, this is a  clear and convincing reason for the ALJ to reject her subjective testimony.

**b.        Poor Work History/Fixation on Disability**

The ALJ also cited Dubie's poor work history and "unusual fixation on obtaining disability benefits" as reasons for finding her subjective complaints incredible.  Tr. 698.  An "extremely poor work history" is a clear and convincing reason for discounting a claimant's testimony.  *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002).  Dubie admits that she has not worked since the early 1990s and had very little work experience prior to that.  Instead, starting at age 28, she embarked on a continuous effort to obtain social security benefits, filing a total of five applications.  Dr. Lichtenstein observed in May 2002 that Dubie continued "to focus on her disability" (Tr. 1478), and Dr. O'Connell found that "she has committed considerable energy over the course of the last decade in establishing herself as a disabled person" and was "so strongly focused on this" that he was "doubtful that she would have any additional time or energy to invest in psychological services."  Tr. 1478, 1459, 1507.  Her extremely poor work

history and fixation on disability are clear and convincing reasons for doubting Dubie's

credibility.

c.    <u><strong>Minimal Treatment and Failure to Follow Recommendations</strong></u>

The ALJ also found Dubie's credibility limited because she had sought only mild

treatment for her complaints of totally disabling pain and failed to follow her physician's

recommendations for other treatment.  Both of these are legitimate reasons for disbelieving a

claimant's testimony.  *Parra v. Astrue*, 481 F3d 742, 750-51 (9th Cir 2007) ("evidence of

'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an

impairment") (citation omitted), *cert denied*, 128 S Ct 1068 (2008); *Fair v. Bowen*, 885 F2d 597,

603 (9th Cir 1989) ("Another such form of evidence [that the ALJ can rely upon to find a pain

allegation incredible] is an unexplained, or inadequately explained, failure to seek treatment or

follow a prescribed course of treatment.").  In May 2002, Dr. Lichtenstein noted that even

considering her claims of exacerbated symptoms since the accident, Dubie would "continue with

the same measures of conservative management which, albeit slowly, has [*sic*] helped her in the

past."  Tr. 1478.

The only consistent form of treatment Dubie then sought was prescription pain killers.

Ultimately, Dr. Lichtenstein discharged Dubie as a patient.  While Dubie asserts that no

inferences can be drawn from this, one examining physician believed it was possibly because she

was trying to find another doctor that "will write for more narcotics that Dr. Lichtenstein."

Tr. 6127.  The same doctor noted she was having symptoms of narcotics withdrawal.  *Id*.

Both before and after the accident, Dubie's doctors instructed her to quit smoking as it

could affect her pain level.  Tr. 1489, 1438.  She did not.  Tr. 1655.  Several physicians

recommended she increase her physical activity and seek physical therapy.  Tr. 1438, 1507.

There is no evidence that she did so.  According to Dr. Lichtenstein, she was not interested in

surgery, rendering further MRIs unnecessary.  Tr. 1478.

    The ALJ did not err in citing these reasons as a basis to find Dubie's complaints

incredible.

### d.    Medical Record

    Finally, the ALJ cited the lack of objective medical evidence supporting Dubie's

subjective complaints.  While this cannot be the sole factor for finding a claimant's complaints

incredible, it can be one factor among others.  *Robbins*, 466 F3d at 884.  An MRI in 2001 did

show some degenerative changes in her back.  However, Dr. Louie concluded that this would not

cause the lower back pain or pain in her right leg, but could cause pain in her left leg.  Further,

he opined that the MRI findings could be a chronic and old finding.

    On the day of her December 2001 accident, an x-ray of her cervical spine revealed no

obvious fractures and no significant abnormality in her thoracic spine, but only evidence of mild

degenerative spurring.  In a follow-up appointment, Dubie told Dr. Lichtenstein that she actually

hurt a lot less than she thought she would given her prior accidents and chronic neck and back

problems.  On physical examination, Dr. Lichtenstein found that although she reported her neck

and back still hurt, she had only mildly limited neck rotation and full flexion and extension of

her spine, though there was pain at maximum extension.  Tr. 1507.

    A March 2004 CT scan of her lumbar spine was "essentially negative," showing only

mild posterior osteophyte, right lateral at L4-5 and mild disk space narrowing at L3-4 and 4-5

levels.  Otherwise there was no spinal stenosis or other severe problem.  Tr. 1628.

More recently, Dr. Kho examined Dubie and found her muscle strength, tone and bulk were "5/5."  Tr. 1656.  This contradicts her claim that her "muscles have atrophied."  Tr. 1643. He noted normal findings at all the cranial nerves he tested, normal gait and station and toe, heel and tandem walk, and normal deep knee bend.  Apparently in light of the absence of objective physical findings, Dr. Kho opined that Dubie's pain was primarily psychogenic and not physical, even though he conducted no psychological tests.  Tr. 1656.

Finally, other than Dr. Lichtenstein's statement to Dubie that all of her symptoms *"could easily be* accounted for" by fibromyalgia, there is no medical diagnosis of this condition during the period under review based on clinically accepted clinical or laboratory findings.  Tr. 1603 (emphasis added); *see* 20 CFR § 416.929(a) (". . . statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . .").  While Dr. Lichtenstein assessed Dubie with chronic fibromyalgia (Tr. 1605) and suggested treatment, he provides no basis other than his belief of her subjective complaints.  Also, the most recent neurologist to examine Dubie, Dr. Kho, did not diagnose her with this condition.  The other medical evidence in the file on this diagnosis is contradictory.

In general, the medical record shows that objective testing of Dubie's condition has consistently produced mild results.  Despite her claims of chronic disabling back pain and fibromyalgia, most objective examinations showed only mild degeneration of her cervical and lumbar spine.  While these could be expected to produce some level back pain, they fall short of supporting her claim of total body disabling pain which renders her unable to get out of bed for

more than a few hours at a time each day.  Under these circumstances, the lack of objective medical evidence supporting her complaints of severe pain is a clear and convincing reason for doubting her credibility.

### 4.    Conclusion

The ALJ gave other reasons for doubting Dubie's credibility.  Even if these other reasons are not clear and convincing, the ALJ provided clear and convincing reasons, as discussed above, to find Dubie not credible.  "[W]here, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation . . . and those findings are supported by substantial evidence in the record, [the Court's] role is not to second-guess that decision."  *Fair*, 885 F2d at 604.

### C.    Medical Opinions

#### 1.    Dubie's Challenge

Dubie argues that the ALJ improperly rejected the opinions and ultimate conclusions of her treating and examining physicians, including Drs. Kho, Lichtenstein, Basin, Louie and Rawlins, concerning the severity of her impairments without providing adequate justification supported by substantial evidence.[8]  Instead, she asserts, the ALJ substituted his own opinion for that of these medical sources and made independent medical findings and speculative inferences from the medical evidence.

#### 2.    Legal Standards

---

[8]  Dubie points to medical opinions from physicians whose examinations and diagnoses predate the 2002 decision by the ALJ.  The ALJ was not required to consider these as part of Dubie's claim that her condition had changed since the 2002 decision.  These earlier opinions do not address her condition during the period under review, and thus are not relevant to her claim that her condition worsened after her December 2001 accident.  To the extent that they support the fact that she was disabled prior to the 2002 decision, they are irrelevant as that decision is binding on that issue.

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See Batson*, 359 F3d at 1195 (citation omitted).  Generally, a treating physician's opinion is afforded the greatest weight in disability cases because "the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations and internal quotation marks omitted).  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

A treating physician's opinion on the nature and severity of the claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the record.  20 CFR § 416.927(d)(2).  An uncontradicted treating or examining doctor's opinion may only be discredited for "clear and convincing reasons." *Thomas,* 278 F3d at 957 (citation omitted).  If it is contradicted by the opinion of another doctor, the ALJ may reject the treating or examining doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F3d at 830 (citation omitted).

Similarly, the ALJ is "not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability" if the ALJ gives clear and convincing reasons for rejecting those opinions. *Reddick*, 157 F3d at 725, quoting *Matthews v. Shalala*, 10 F3d 678, 680 (9th Cir 1993).  "A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record.  In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Id* (internal

citation omitted).  Testimony from a non-examining expert ordinarily does not warrant rejection

of a treating physician's opinion.  *Lester*, 81 F3d at 830-31; *Pitzer*, 908 F2d at 506 n4.   In other

words, the ALJ may reject the testimony of an examining physician in favor of a non-examining

physician only by giving specific, legitimate reasons supported by substantial evidence in the

record.  *Roberts v. Shalala*, 66 F3d 179, 184 (9th Cir 1995).

///

///

### 3.    **Analysis**

In general, the ALJ properly evaluated the opinions of the various treating and examining

physicians in the file.  There are four opinions of Dubie's functional capacity during the relevant

time period by Dr. Lichtenstein (Tr. 1472, May 2002), Dr. O'Connell (Tr. 1445-46, May 2002),

Dr. Rawlins (Tr. 1641-50, Dec. 2003-Jan. 2004), and Dr. Kho (Tr. 1654-61, Nov. 2005).  These

opinions contradict one another to some extent.

All the doctors appear to agree that Dubie experiences chronic pain which affects her

ability to work.  Drs. O'Connell, Rawlins, and Kho all believed that Dubie's physical problems

had a strong psychogenic basis.  Dr. O'Connell expressed this view in his diagnosis of "Pain

Disorder Associated with Psychological Factors and a General Medical Condition."  Dr. Rawlins

gave the same diagnosis, and Dr. Kho diagnosed "Psychogenic pain syndrome."  Dr.

Lichtenstein felt that her symptoms could be explained by a diagnosis of fibromyalgia.  All of

the doctors also found that she experienced some level of chronic back pain.  The ALJ does not

dispute their diagnoses since he found the medical record supported a finding of degenerative

disk disease of the lumbrosacral spine and pain disorder.

Where these opinions conflict is in the functional limitations imposed by these disorders. Dr. Lichtenstein opined that Dubie had no mental restrictions on her functional capacity and could stand, walk, sit, carry weight, and handle objects to an extent that supports a capacity for work. Dr. Kho's opinion contradicted Dr. Lichtenstein, in part, on the postural limitations (although is report is ambiguous on this point) and handling limitations. Dr. O'Connell's opinion that Dubie has marked limitations in the area of social functioning is at odds with Dr. Lichtenstein's opinion that Dubie had no restrictions in "social interacting." The same is true of Dr. Rawlins' opinion that Dubie's symptoms of Dysthymia and Somatization Disorder "significantly impair her functioning in all aspects of her life," which conflicts with Dr. Lichtenstein's finding of no such restrictions. Because of these conflicts, the ALJ was required only to give specific and legitimate reasons for rejecting a portion of any one of these opinions which was not supported by the medical record.

The ALJ rejected Dr. O'Connell's opinion of more severe limitations because his report had internal contradictions and relied heavily on Dubie's incredible subjective complaints. The ALJ concluded that Dr. Connell's finding of marked limitations in social functioning was inconsistent with the GAF of 60 he assigned to Dubie. According to the ALJ, a GAF of 60 was on the border of the 61-70 range which denotes only "mild functional loss." Dubie correctly points out that 60 is still within the 51-60 range which denotes "moderate difficulty in social . . . functioning." DSM-IV, p. 32. However, this is still inconsistent with Dr. O'Connell's selecting "marked restriction" in social functioning. The ALJ adequately accounted for Dubie's limitations in social functioning by including in his hypotheticals the restriction that Dubie have limited public interaction. The ALJ also rejected Dr. O'Connell's opinion of Dubie's functional

capacity because it relied heavily on Dubie's incredible subjective complaints.  This was not error.  "A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been "properly discounted."  *Morgan*, 169 F3d at 603, quoting *Fair*, 885 F2d at 605.

The ALJ rejected Dr. Rawlins' opinion for the same reasons.  He found Dr. Rawlins' explanation for Dubie's failure to produce a valid MMPI-2 unpersuasive in light of the fact that Dubie had repeatedly failed to produce an acceptable result which indicated that she consistently overelaborates and exaggerates her symptoms.  Because Dubie was not a reliable informant on her own problems, any conclusions drawn from her self reports was also suspect.  Thus, the ALJ did not err in rejecting Dr. Rawlins' conclusions as to the severity of Dubie's functional limitations.

The ALJ rejected Dr. Kho's opinion of Dubie's limitations for several reasons.  First, he found the responses on the functional capacity form at odds with those in the body of the report. In the report, Dr. Kho indicated that Dubie could stand, sit and walk for four hours in an eight-hour day (Tr. 1657), but on the form he indicated lower thresholds which imply that Dubie cannot work an eight-hour day.  Tr. 1658-61.  He also gave contradictory opinions as to Dubie's manipulative limitations by checking the boxes indicating that she was unlimited in her ability to reach in all directions, and in handling (gross manipulation), fingering (fine manipulation) and feeling, yet concluded she could do these activities only occasionally.  Tr. 1660.

The ALJ also rejected Dr. Kho's opinion as conflicting with those of Dr. Lichtenstein and the two non-examining reviewing physicians.  It does conflict with the opinion of

Dr. Lichtenstein who, as discussed above, would presumably be more familiar with the Dubie's physical limitations.

Further, the ALJ found that Dr. Kho's conclusions were based upon psychological factors rather than the neurological and physical exam he conducted. Dr. Kho's exam produced only mild findings. Yet he found Dubie to have significant limitations due to pain which was psychogenic in nature. Because Dr. Kho did not perform any psychological testing, the ALJ found that Dr. Kho's opinion was given in an area outside of his expertise and had to be based upon Dubie's subjective complaints, which, as discussed above, were not credible. These are specific and legitimate reasons for rejecting the functional capacity portion of Dr. Kho's opinion.

Finally, the ALJ assigned significant weight to Dr. Lichtenstein because he was Dubie's treating physician. This court notes that the ALJ did not fully credit Dr. Lichtenstein's opinion, but accepted the limitations proposed by the DDS physicians instead. The ALJ failed to provide any reasons for doing so. To the extent that this is error, it is harmless because the ALJ also posed a hypothetical to the VE which incorporated Dr. Lichtenstein's opinions. Based on these limitations, the VE found that Dubie could work.

The ALJ adequately weighed the medical evidence in the record. His decision to afford certain opinions greater weight than others is supported by the record.

## **ORDER**

After a searching review of the record, the court concludes that the Commissioner's decision is supported by substantial evidence and free from harmful legal error. Therefore, the Commissioner's decision is AFFIRMED.

DATED this 9th day of December, 2008.

40 - FINDINGS AND RECOMMENDATION

/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge